FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2023 FEB 27 PM 3:37

JEFFREY P. COLWELL
CLERK

BY_____DEP. CLK

1/30

THE UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO
901 19th Street
Denver, CO 80294-3589

| | |
|---|---|
| Todd Wargo | |
| Plaintiff | |
| v. | Case No. |
| Crossroads Towing and Recovery, a Colorado Corporation | |
| (CO Company No. 20218045237) | Div. |
| & | |
| Kelsey Reapsome Clendenin, individually, and as owner/agent | |
| Crossroads Towing and Recovery | |
| & | |
| Vonda Ulander, individually, and as owner/agent | |
| Crossroads Towing and Recovery | |
| Defendants | |

## COMPLAINT

## VENUE

This Court has jurisdiction over the parties and the subject matter of this action. Venue is proper whereas Plaintiff is a resident of the State of Colorado, and the parties and entities named reside in, or conduct business in, or are agents of business entities operating within the State of Colorado.

The principal Defendant corporation Crossroads Towing and Recovery has a state registered office of 3700 Canal Drive, Ft. Collins, CO 80524; and, the named individuals have the same address.

## BACKGROUND SUMMARY

> "I always have wondered why there are two different fee schedules for consensual versus nonconsensual tows and I've seen it cause difficulty on some individuals trying to get their vehicles back."

### The Incident

1.    On or about January 19, 2023 Defendant company and their tow truck driver(s) attended a vehicle crash site subsequent to a traffic incident which took place in the late evening [11:30 pm. approx.] on Interstate 25 in Colorado.

2.    Agents (drivers) of the Defendant's company arrived sometime in the early morning of the 19th, somewhere between 1 a.m, and 3 a.m.

3.    The authorization for their involvement and attendance is yet fully unknown.

4.    The crash incident occured when the driver (Plaintiff) Todd Wargo encountered ice on the road while northbound near Berthoud, CO.  In attempting to correct from travel on an icy patch, Defendant lost control of the vehicle while in the slow lane, causing his Ford F-250 pickup to skid sideways to the right (east).

5.    Attached to that pickup was a camper trailer which, while it did not disconnect (held by bumper chains) spun his truck around and dragged it off the highway into a snowbank.  The combined truck and trailer were simultaneously skidded off the highway by momentum. In the course of this slide, at one point, the driver's side trailer tires gripped sideways into the snow and the trailer did a one-half, slow rollover onto its roof.

6.     The two chained vehicles came to rest more than ten feet off the edge perimeter [white line] of the highway. Consequently, the vehicles were significantly displaced far enough off the highway as to not pose obstruction or interference to any active highway traffic.

7.     Because of the deep snow on the roadside, the vehicles velocities were decelerated once they left the highway shoulder. As described, with certainty, no other vehicles, nor pedestrians, nor other roadside objects were involved, or affected by the events.

8.     Upon the vehicles coming to a rest, Plaintiff driver exited his undamaged driver's door, and walked around the trailer several times.  It was dark, but Plaintiff observed very little miscellaneous debris was visible, incidental to the crash.

9.     Regardless, because of the steady deceleration of the vehicles as they encountered the deep snow, Plaintiff perceived not much had escaped the trailer.

10.     Such debris included a few household miscellaneous items that likely emerged from an open window or perhaps from rips in the trailer body.

11.     The Colorado Highway Patrol was summoned soon after by an approaching motorist.  The first officer arrived at a documented 11:31 pm. Several traditional rescue units were summoned and arrived - a firetruck, and in time, a police vehicle from a local jurisdiction.

12.     At rest, both vehicles were readily accessible from the highway shoulder. In the interval between the crash and the arrival of government emergency units Plaintiff was able to walk around the

trailer multiple times. Rescuers and patrolmen on the scene also had ready access on foot to the perimeter of the two vehicles.

13.     Within ten minutes of the arrival of the first Colorado Highway Patrol (herein 'CHP') officer, and at the urging of the rescue personnel, Plaintiff and his passenger were offered to be transported to a local hospital for examination. Plaintiff and his passenger rode to that hospital together. Neither party was seriously hurt, and both were discharged within the early morning hours of January 19, 2023.

**Identification of Crossroads Towing and Recovery as the removal agent**

14.     Plaintiff, in that early morning contacted the Colorado Highway Patrol dispatch who informed him his vehicles had been removed by a towing company. Plaintiff was surprised and disappointed to learn his vehicles had been moved. In pursuit of more information, Plaintiff spoke further to a Highway Patrol telephone agent who provided him with their CHP incident number for the event. This telephone agent further gave Plaintiff confirmation his vehicles had been removed.

15.     That destination for his vehicles was reported to be the storage lot of Crossroads Towing and Recovery in nearby Ft. Collins, CO.

16.     Notably, Plaintiff had made forthright declarations to both the on-scene police officers of the Colorado Highway Patrol he had spoken to, and to the CHP officers that checked on his well-being at the end of his hospital stay. To each, Plaintiff declared his pickup and trailer should be left in place until he could get back to resolve their fate himself.

17.    Plaintiff proceeded to call Defendant company, Crossroads Towing and Recovery.

on their referenced telephone number, a call which was answered by an identified desk manager

of Crossroads. Notably, no one from Crossroads had contacted him at the hospital in spite of his

telephone number being on record with the CHP.

18.    Plaintiff, in that first conversation, was informed that in fact 'yes', Crossroads had responded;

and, 'yes', Plaintiff's pickup and camper had been hauled to Crossroads tow yard in Ft. Collins,

CO.

19.    Plaintiff's recollection from the time of the accident was that his pickup was intact, with some

denting, but that it was otherwise undamaged, and likely drivable.

20.    Plaintiff's recollection was his truck's engine was still running, with the keys in the ignition

when he exited the vehicle at the time of the incident.  Plaintiff expected to be told his truck was

virtually intact and operable. That truck being his only means of transport, Plaintiff needed to

recover the vehicle as soon as possible.

21.    Plaintiff expected to be further told - by confirmation of his own perception/deductions - that the

trailer was likely a total loss having been turned upside down and structurally damaged. Still, the

truck being likely drivable, Plaintiff needed to recover the truck that day if possible.

22.    Plaintiff's recollections of the crash scene were later reinforced upon viewing of a third party

photograph showing the position and condition of the vehicles in place on the scene. [Exhibits 1.

& 2.]

23.    The following photos are the overture to Plaintiff's allegations ***Defendant's have failed to provide truthful causation for their invoice claims*** as described later in this Complaint.

One such excuse was, as vocalized by Crossroad's General Manager Kelsey;

   ***"And the stuff he had in there, which was a lot of stuff, that spread all over the highway."***

24.    Regardless, and significantly, both images wholly support the observable and determinable fact the truck and trailer were well distanced off the I-25 highway tarmac.  This began investigation and documentation of a series of comparisons between what Plaintiff had been told by Crossroads, and the actual fact profile of their involvement.



PHOTO [Exhibit 1.] SHOWING PLACEMENT OF PLAINTIFF'S VEHICLES



PHOTO [Exhibit 2.] ENLARGED DISPLAYING NO TRAFFIC IMPEDIMENT

EXISTED BECAUSE OF VEHICLES OR DEBRIS



ATTENDANCE BY THE COLORADO STATE PATROL

25.    As noted, the CHP arrived on the scene at 11:31 pm. on the night of January 19th and very soon

after, Plaintiff and his passenger were transported via ambulance to hospital.

26.    Partial documentation of CHP participation is archived as incident case number CSP 3A230124.

The attending officer was Jeremy Sugai.

27.    Officer Sugai completed his report regarding the incident, and that report is provided here as

[Exhibit 3. p1/p2/p3]  Notably, the report confirms the incident occurred on I 25, Federal

jurisdiction.

Ex. 3, page 1

 **COLORADO**
Department of Revenue
Division of Motor Vehicles

1881 Pierce St
Lakewood, CO 80214


February 17, 2023
Letter:   L0095129377

## STATE OF COLORADO - Accident Representation (DR3447)

Case Number: 3A230124         Date of Report: 20-Jan-2023    Amended:   No      Public Land:  No
Agency:      CSP - COLORADO STATE PATROL              ORI:       CSP/ANY

| | | |
|---|---|---|
| Date of Accident:  18-Jan-2023  Time:  23:25 | # Killed: | 0 |
| Date Arrived:      18-Jan-2023  Time:  23:31 | # Injured: | 1 |
| Date Roadway Cleared:  18-Jan-2023  Time:  : | # Vehicles: | 1 |
| Date Last Responder Left: 19-Jan-2023  Time:  06:30 | # Non-Motorists: | 0 |

Officer Name:  SUGAI                Officer Number:  8204       Detail:        RCITY
Agency Code:  M12                 Investigated @ Scene:  Yes   District Number: 3A

County:    WELD                  County #: 03          Secondary Crash:    No
City:      BERTHOUD                                    Juveniles Involved:   No
Latitude:  40.29483        Longitude: -104.97995       School Zone:        No
                                                       Construction Zone:  No
On Road/Street:  INTERSTATE 25
Referencing:                                           Intersection Offset Distance Unit:
HWY #:                  Mile Point:   249.00    Distance:    0.00    Direction:
Interstate HWY:  Yes    City St/Cnty Rd:  No    Milepoint Offset Distance Unit:       02
State HWY:       No     Other Rdwy:       No    Distance:    2,112.0  Direction   N
                                                             0

| | | |
|---|---|---|
| Location:              01 | Number of Lanes Blocked:   0 | Lane Position:      N01 |
| 1st Harmful Event:     01 | Road Contour - Curves:    01 | Road Description:   04 |
| 2nd Harmful Event: | Road Contour - Grade:     04 | Road Condition:     02 |
| 3rd Harmful Event: | Approach/Overtaking Turn:  03 | 1st Weather Condition: 03 |
| 4th Harmful Event: | Lighting Condition:       04 | 2nd Weather Condition: |
| Most Harmful Event:    01 | | |

### Fatal Supplement

Time Notified:       :        Traffic Ctrl Dev. Functioning:
Time Arrived @ Scene:  :      Name of Responding Services:
Time Arrived @ Hospital: :

Page Number: 1  of 3        Case #:  3A230124                      dL778

Wargo v Crossroads   Complaint,  Dist of Colo   02.27.23

Ex. 3, page 2

## Traffic Unit Information

| | | | | | |
|---|---|---|---|---|---|
| **T.U. #:** 1 | **License State:** CO | | | **Hit & Run:** | No |
| | **License Number:** 171389205 | | **CDL:** | **Non-Contact Vehicle:** | No |
| **Last Name:** WARGO | **First Name:** TODD | | **MI:** A | **Phone Number:** (918) 840-3075 | |
| **Date of Birth:** 16-Jul-1960 | **Gender:** Male | | **Email:** | | |

**Driver Address:** 950 N 1ST ST Johnstown CO 80534

## Vehicle Information

| | | | | |
|---|---|---|---|---|
| **License Plate State:** CO | **Year:** | 2006 | **Common Code:** | 139 |
| **Plate Number:** OCK150 | **Make:** | GMC (GENERAL MOTORS) | **Citation Number:** | 6326228 |
| **VIN:** 1GTHK23D06F169075 | **Model:** | Sierra | **Primary Violation:** | Careless Driving Caused Bodily Injury |
| | **Body Type:** | PK | **Violation Code:** | 42-4-1402 (2)(b) |
| | **Color:** | WHI | **DUI:** | No |
| **Owner Same as Driver:** Yes | **Last Name:** WARGO | | **First Name:** | TODD | **MI:** A |

**Vehicle Owner Address:** 950 N 1ST ST Johnstown CO 80534

## Insurance Information

| | | | |
|---|---|---|---|
| **Insured:** | No Proof | **Insurance Company:** | |
| **Expiration Date:** | | **Policy Number:** | 0 |

## Damage Information

| | |
|---|---|
| **Towed:** 01 | **Towed By:** CROSSROADS TOWING AND RECOVERY ( (Landline) (97... **Trailers:** No Trailers |
| | **Towed To:** 3700 CANAL DRIVE, FORT COLLINS, CO USA 80524 |

**Vehicle Defect / Condition:** 15

**Crash Avoidance Maneuver:**

**Fire/Hazmat Involvement:**



**Undercarriage:**

## General Vehicle Fields

| | | | | | |
|---|---|---|---|---|---|
| **Vehicle Type:** | 07 | **Roadway Speed Limit** | 65 | **1st Contributing Factor:** | 17 |
| **Special Function:** | 00 | **Estimated Vehicle Speed:** | 55 | **2nd Contributing Factor:** | |
| **Emergency Lights:** | No | **Driver's Stated Speed:** | | **3rd Contributing Factor:** | |
| **Direction Of Travel:** | 01 | **1st Driver Action:** | 17 | **Autonomous Vhc Capability:** 00 | |

Page Number: 2 of 3          Case #: 3A230124                                dL778

Ex. 3, page 3

| Vehicle Movement: | 01 | 2nd Driver Action: | | Driver Ceded Control: | No |
|---|---|---|---|---|---|

### All Involved Information

| T.U. # | Pos. | Restr. | Endor. | Eject. | Ej. Path | Saf Avail. | Saf Use | Saf Helmet | AB Deploy | AB Type | Inj Severiy | Age | Se |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 01 | 00 | 00 | 00 | 00 | B | 01 | A | 01 | A | 01 | 62 | M |

| Susp. Alc. | Alc Tested | Susp. MJ | MJ Tested | Susp. Drugs | Drugs Tsted | EMS Trip # | Taken To | Dead at Scene | Exp Date |
|---|---|---|---|---|---|---|---|---|---|
| 07 | 00 | 02 | 00 | 06 | 00 | | | | |

| Full Name | Address | Trans. By | Exp Time |
|---|---|---|---|
| TODD A WARGO | 950 N 1ST ST , Johnstown, CO, 80534, USA | | |

| T.U. # | Pos. | Restr. | Endor. | Eject. | Ej. Path | Saf Avail. | Saf Use | Saf Helmet | AB Deploy | AB Type | Inj Severiy | Age | Se |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 13 | | | 00 | 00 | A | 00 | A | 01 | A | 02 | 23 | F |

| Susp. Alc. | Alc Tested | Susp. MJ | MJ Tested | Susp. Drugs | Drugs Tsted | EMS Trip # | Taken To | Dead at Scene | Exp Date |
|---|---|---|---|---|---|---|---|---|---|
| | | | | 03 | 00 | | | | |

| Full Name | Address | Trans. By | Exp Time |
|---|---|---|---|
| GLORIA A ARMIJO | | | |

### Narrative

Vehicle 1 was a pickup truck pulling an approximately 30' long RV camper. Vehicle 1 was northbound on Interstate 25 near milepost 249 in the number one lane. Heavy fog was present on this stretch of the Interstate. Vehicle 1 swerved to the right and began to rotate clockwise with the RV still attached. Vehicle 1 remained on all 4 tires as it traveled off into the snow. The RV camper pulled by Vehicle 1 overturned one half time onto its roof, where Vehicle 1 and the RV came to final rest off the right shoulder in the snow. Vehicle 1 faced southwest at final rest and the front of the RV faced southeast at final rest.

28.    As described, in that initial telephone contact with the Crossroads desk agent - who identified

herself a co-owner of Crossroads Towing and Recovery - it was disclosed to Plaintiff the

TOWING SERVICE CHARGE was to be: **$29,620.00!**

                    TWENTY NINE THOUSAND, SIX HUNDRED AND TWENTY DOLLARS

29.    With disbelief, thinking his bill had surely been confused and exchanged with another entity,

Plaintiff asked the Crossroads desk agent to confirm the numbers referred to on her first verbal

recitation of the invoice.  She repeated that amount to be correct.

30.    Exhibit 4.  [Exhibit 4. Email affirming invoice amount, Total: $29,620.00]

---

Crossroads Towing and Recovery Services LLC
<ct125583@towbook.net>

 Tue, Jan 31, 8:50 AM

Attached is a PDF copy of the impound ticket for the vehicle towed from I-25 N, Berthoud,
80534, CO.

To view it, please open the attachment.

If you cannot open the attachment, you can download Adobe Acrobat Reader from

http://get.adobe.com/reader/

Reason: Accident

Vehicle: 2006 GMC Sierra 2500HD  White

License: OCK150 (CO)

VIN: 1GTHK23D06F169075


Location: I-25 N, Berthoud, 80534, CO

Destination: CROSSROADS TOWING & RECOVERY SERVICES LLC,

3700 CANAL DR #A, FORT COLLINS CO 80524


Date/Time Impounded: 1/20/2023 @ 9:03 AM


**Invoice Total: $29,620.00**


If you have any questions, please feel free to contact us.

Crossroads Towing and Recovery Services, LLC

970-419-8697


Sent using Towbook

---

31.    **Exhibit 5.**  [Exhibit 5. 'Impound Invoice' to Plaintiff, dated (day before) on January 20, 2023]

**Crossroads Towing and Recovery Services, LLC**
PO Box 156, Fort Collins CO 80522-0156
Phone: (970) 419-8697 | Fax : (970) 416-8697

**Impound Invoice**
Printed 1/31/2023

| | | | | |
|---|---|---|---|---|
| Call # | 5307 | Reason for impound | Accident | |
| Stock # | 13373594 | VIN Number | 1GTHK23D06F169075 | |
| Account | (No Account Specified) | Model | 2006 GMC Sierra 2500HD (White) | |
| Date/Time Impounded: | 1/20/2023 9:03 AM | License Plate | OCK150 (CO) | |
| | | Drivable | No | |
| | | Keys | Yes | |
| | | Towed from | I-25 N, Berthoud, 80534, CO | |
| | | Stored at | CROSSROADS TOWING & RECOVERY SERVICES LLC | |
| | | | 3700 CANAL DR #A, FORT COLLINS CO 80524 | |

| Storage charges | Quantity | Price | Line Total |
|---|---|---|---|
| (Storage - Storage Fees) Impounds/Storage: Daily Impound Rate | 12 | $105.00 | $1,260.00 |

| Towing charges | Quantity | Price | Line Total |
|---|---|---|---|
| (Towing) State Patrol (price per hour) | 12 | $285.00 | $3,420.00 |
| (Towing) Heavey rotator | 12 | $685.00 | $8,220.00 |
| (Towing) Landoll trailer | 12 | $685.00 | $8,220.00 |
| (Towing) Skid steer | 12 | $500.00 | $6,000.00 |
| (Towing) Trash removal | 1 | $2,500.00 | $2,500.00 |

| | | |
|---|---|---|
| | Towing Subtotal | $28,360.00 |
| | Storage - Storage Fees Subtotal | $1,260.00 |
| | Subtotal | $29,620.00 |
| | Taxes | $0.00 |
| | Grand Total | $29,620.00 |
| | **Amount Due:** | **$29,620.00** |

Crossroads Towing and Recovery Services, LLC appreciates your business; if you have any questions regarding this invoice, please contact us at (970) 419-8697.

Signature: _____ Date: _____

Driver Signature: _____ Date _____

USDOT: 1459290  PUC# 3718

32.    As documented by Crossroad's bill, the claimed amounts were for three large transporting units which were billed for 12 hours each and $2,500 for 'cleanup', *roughly comparable to the rental price of four full size dumpsters, each the length and width of the trailer.*

Wargo v Crossroads  Complaint,  Dist of Colo  02.27.23

33.    Notably, in later conversations, the escalating price of the bill, as reflected in this invoice,
increased $105.00 per day.  That is equivalent to $3000+ per month for bare ground storage on a
dirt lot ; e.g., *roughly equivalent to the rental price of a significant home in surrounding Ft.
Collins.*

ATTEMPTED ANALYSIS OF THE INVOICE

AND REFERENCES TO THE ON-SITE TIMING OF PARTICIPANTS

34.    In the CHP case report, it is shown that the towing was ultimately performed by Crossroads
Towing and Recovery, as identified.  In his telephone interview with Plaintiff's aforementioned
associate Stephen Boulter, Officer Sugai stated that it was his recollection he had heard several
towing companies had attended, but denied wanting the tow work.  It was his understanding that
ultimately Crossroads arrived (perhaps) very nearer 3 am. as the assuming vendor.

35.    The officer's document further states that the last of his patrol units left the scene at 6.30 am on
the 19th.  Meanwhile, Crossroads' invoice states their crew returned to tow lot base at 9:03 am.

36.    As mentioned, there is some probability that Crossroads was not involved until almost 3 am.  If
so, their stated arrival at their towing lot at 9:03 radically contradicts Crossroads own invoice
and alleged claim of participation for 12 (hours) of time for each of four or five presumably
large towing trucks and trailers as their invoice claims. Regardless, by extension thereby, little
urgency was likely involved because there were no personal injuries and the highway traffic
flow was not impeded in any way.

37.    And, while the difficulty to load each of the vehicles is naturally relative to the billing, common
sense declares that to load and transport an ordinary pickup truck, an appropriate fee in the
hundreds of dollars is appropriate.  As claimed, Plaintiff was near certain his pick up truck was

still likely drivable, or at least readily movable and thereby easily loadable onto a conventional

tow truck.

38.     Consultation with professional towing experts has further disclosed that if practical the trailer

would be flipped to its wheels.  That was not the procedure in this case.  As declared by Kelsey,

they used a crane of some kind and straps and picked up the unit for hauling.  On the other end,

at the tow yard the process was duplicated and according to her testimony the vehicle is on the

ground in the same configuration.   Again professional opinion is that such a procedure would be

accomplished in probably less than two hours, and the load sent back to storage.

39.     Again, the weight calculation would suggest that the trailer was a small challenge for a big truck

with an industrial crane.  The question remains as to why that method was chosen.

40.     Regardless, the plausibility gap between what was required for the recovery of the vehicles, and

what really happened is to be discovered.  As of this filing, in spite of multiple requests and

multiple promises from Kelsey the mandatory four plus pictures from the scene have not been

forthcoming.

41.     Consequently, and logically, the loading of the pickup was no more complicated than any

ordinary outloading due to the fact the vehicle was accessible, and according to witnesses, was

easily movable since the keys were still in its ignition.  <Presence of those keys is validated in

the Crossroads invoice.>

42.     Further inquiry of the technicians on site that night will reveal the true difficulty and/or

complexity of the work.  Also, for the record, Kelsey, in spite of her senior position with the

company and presumably having comprehensive access to the details of the process - and access

to the technicians - her representations of what happened that night are significantly unclear. As documented, on multiple occasions the facts have been in conflict with her disclosures.

## ANALYSIS OF RECOVERY COSTS

43.    As to the handling of Plaintiff's personal property, Kelsey was unclear how much property from inside the trailer was ejected, and also without notes or knowledge as to how Plaintiff's property was gathered or protected thereafter.  Kelsey has confirmed that no protection of the trailer from snow/the weather was provided or achieved once the trailer was in Crossroad's possession.

44.    Nor can/will Kelsey describe or confirm how much of, or how many of Plaintiff's personal items were recovered or collected from the scene, what they might be, or how or where they are stored. Kelsey was, from the outset, very confirming however that she/Crossroads were in possession of Plaintiff's personal effects; and that *any of Plaintiff's assets of marketable value* were *absolutely going to be retained by Crossroads and sold by Crossroads 'to pay their help'*.

45.    Throughout, and beyond pursuing his hopes for recovery of something of his possessions, Plaintiff sought contextual understanding toward what things cost to be towed, and why.

46.    Plaintiff projected his tow bill (to a company with which never reached out to Plaintiff, had never asked for authorized for services) would likely be large only if: ;

    a)    the highway had been blocked or damaged as the result of the incident;

    b)    if any of the cargo he was carrying was large in volume.  In this case, the volume was only that of a pull behind, tow hitch holiday size trailer;

    c)  if Plaintiff had been carrying any kind of toxic or hazardous substance (which he was

        not) which could have potentially leaked or been spread on the road, or proximate to

        the road;

    d)  traffic been affected as might be the case in a blizzard or other weather related event, or

        as part of a multi-vehicle event, none of which occurred in this case;

and, finally

    d)  if the active vehicles - his truck and trailer - were industrially large or industrially

        heavy, which they certainly were not.

47.     In Plaintiff's mind, based on Plaintiff's lifelong experience with highway travel, none of these

       'surcharge' elements were present.  Consequently, none of these variables would be anticipated

       as amplifiers to the cost of ordinary towing or recovery or sequestering of his vehicles and

       property.

48.     Intuitively, Plaintiff was casually aware of the typical cost range of towing by AAA or other

       competitors, ranging from hundreds to perhaps a thousand plus dollars for as much as a twenty

       mile transit. Consequently, Plaintiff's expectation of the cost of recovery (return of his truck, at

       least) and his personal property was hoped to be modest and tangible, but ordinary, even by the

       worst and most exaggerated costing calculation.

### RECONFIRMATION OF CHARGES, AND THE REPEATED OFFERING BY CROSSROADS FOR AVAILABLE 'SATISFACTION' OF THEIR BILL VIA *'ALTERNATIVES'*

49.     The aforementioned Stephen Boulter is a seasoned investigator.  Upon consultation, Mr. Boulter

       immediately challenged the magnitude and details of the charges by Crossroads.

50.     Mr. Boulter suggested Plaintiff seek further documentation and explanations of the charges.

51.    Mr. Boulter also provided a contextual review of Crossroads Towing from a Yelp commentarian, and provided background on towing fair practices in general, explaining the issue of towing (mis) conduct had been the concern and extensive legislative exercise of the state legislature in 2021 and 2022.

52.    Regarding Crossroads, Mr. Boulter provided a recent review;

> You guys are completely slimy the way you treat people. I was involved in an accident receiving a concussion and whiplash. While I was still dazed and trying to figure out what I was going to do about my car and everything that came with this situation. Your driver tells me that he would be towing my car to your lot and that I didn't have a choice. He told me to grab anything I would need for the next couple days and that I would be able to come and retrieve my remaining belongings later. I called you guys earlier today inquiring about when I could come and pick up my stuff and was told in no uncertain terms that I would not be allowed to get anything from my car until I paid your astronomical fees. She informed me with a very unprofessional attitude that I am being charged 250 for the tow and another 250 or so for the storage fees. I am confused by this because the police officer I called after speaking with her said that it is not the case and is in fact illegal. This is due to various laws concerning towing practices that state that a towing company cannot charge a towing fee exceeding $160 and that a "customer" has the right to retrieve their belongings from their impounded vehicle before paying the tow company's fees. I am very frustrated and shocked that a company that is receiving business directly from FCPD would be attempting to extort money out of people that have already endured injuries and the stress that comes with a car accident.

53.    After the initial call by the Plaintiff to Crossroads, Mr. Boulter initiated a telephone conversation with the Crossroads Ft. Collins office for re-verification and in search of clarity.  A second telephone conversation took place on January 29, 2023, with Plaintiff and Mr. Boulter both present on the call.

54.    On the first occasion, the Crossroads business phone was answered from Crossroad's published number - 970.419.8697- and the conversation was participated in by two women who self-identified as Crossroads managers.

> That conversation[1] was recorded as an unlisted youtube video.  Plaintiff Todd Wargo and Kelsey from Crossroads Towing  Recorded by Stephen Boulter, interviewer.   01.30.23  4 pm.

55.    Plaintiff further provides (Attachment, Exhibit 6.) [2] a transcript of that conversation.


**Exhibit 6.  Transcript, Telephone interview, Plaintiff Todd Wargo and Kelsey from Crossroads Towing    Recorded by Stephen Boulter, interviewer.   01.30.23  4 pm.**

> Kelsey:  Crossroads Towing.
>
> Steve:  Hi. Can you hold just a second? Hi. My name is Steve, and who am I talking to?
>
> Kelsey:  My name is Kelsey with Crossroads Towing.
>
> Steve:  Now I have Todd who is on the phone with us now.  Todd is the guy who had the accident on I-25 last week and flipped over the trailer.
>
> Todd told me you guys have the truck and trailer, right?
>
> Kelsey:  Yes.
>
> Steve:  And Todd told me… he sent an email to you today…   Did you get that?
>
> Kelsey:  I did receive it.
>
> Steve:  And then is somebody going to send back an invoice or something?  What is the deal? I'm the guy with the $3000 if that is what is going to happen.  I need an invoice, a bill on letterhead so my bank… you know…
>
> Kelsey:  What exactly do you want?
>
> Steve:  Is there a tow bill made up?
>
> Kelsey:  At this point $30,000.

---

[1] Telephone Conversation, in process for youtube publishing

[2] Transcript (of 3.)

Steve:  All right, that is what I understood.  It was going to be something like $28,000 the other day, right?  What I need is… can you send me an email with that please?

Kelsey:  Of the invoice?

Steve:  Yea.

Kelsey:  Yes, Can I put you on hold for a second?

Steve:  Yea.

Kelsey:  Actually, never mind.  So I can send you that one in the office…. something. You can contact me back during business hours.

Steve:  At this number?

Kelsey:  Yes.

Steve:  Do you have the bill in front of you?

Kelsey:  No. I'm at home.

Steve:  Ok. Ok. You are out of the cold.  Good.  Wow. Ok.  And so, then, what Todd told me.. Todd you are there, right?

Todd:  Yea.

Steve:  Todd told me the arrangement was going to be that… are you familiar with that?

Kelsey:  I'm the one that made the deal.  It doesn't stand for ever.  If we can get something this week.. if he signs over the title

Todd (muffled)

Todd.  Todd. Quiet. I'm trying to hear.  Quiet.

Kelsey:  If he signs over the title for both units, and pays the $3000.

Steve:  Yep.

Kelsey: Then I will let him get his personal belongings.

Steve:  Ok.

Kelsey:  Not of value. So, like, I don't think there is much of value.  He can get his tools and stuff to work.. regular stuff.. but we are going to need to get as much off that as we can to make some money to pay my drivers.  We don't just charge that for fun… it costs money to do stuff like that.

Steve: Allright. So, let me… that's great. So what I understand is that you would need a cashier's check for $3000

Kelsey: I'll take… a cashier's check will work.

Steve: To who?

Kelsey: Crossroads Towing and Recovery.

Steve: Crossroads Towing and Recovery for $3000. And then he just needs to sign over the titles to you… sign them over to Crossroads, right?

Kelsey: He really just has to sign the back of the title… and we'll, we'll put it into our names. We probably won't even do that. We'll probably …at least just crush …well at least the trailer. Cuz it's pretty well destroyed.

Steve: That's what I presumed, yes.

Kelsey: Whatever, he'll have to just sign the back of it.

Steve: Then you're going to write up something. You can send me something on your letterhead that I can use for an invoice.

Kelsey: Yeah, I can send you an invoice.

Steve: That would be just great.

Kelsey: Do you want the invoice to say the full $28,000, or $3,000?

Steve: No. The whole amount. Yea. Ok. That will work. That will work. And, then like I said, I'm going to help him but it'll take a few days.. For me to get up there I'm busy all the time.

Steve: The deal would be we give you $3,000 in a cashier's check…And you write off the 28 or $30,000 or whatever it would cost. Otherwise it would cost $28 or $30,000 or whatever would cost to get the truck back?

Kelsey: Correct.

Kelsey: And all his belongings. We feel for the guy, but also we had a million dollar truck out there for 12 hours, 14, 15.

Steve: What did you have to do? I mean I don't know anything about it. It was off the road and what did you have to do?

Kelsey: So the trailer rolled when you'll see it it will make a whole lot more sense. On its roof, I think. So the trailer is completely destroyed. And the stuff he had in there, which was a lot of stuff, that spread all over the highway. So we had to do the recovery and clean it up for a long time.

> Steve:  Ok, very good. I would plan on calling you…. I've got stuff to do.  What time do you say you go in?
>
> Kelsey:  Normal business hours 8 to 5.
>
> Steve:  I will call you and just email me and send it all over. Thank you.
>
> Steve:  Got um.  That was the conversation I was expecting to have.

56.    As documented, Plaintiff validates his understanding from Crossroads agent Kelsey in this

conversation that Crossroads wants $3000, plus Plaintiff to sign off on the titles to Crossroads to

consent to Plaintiff being allowed to recover his personal items.  Notably, Crossroads agent lauds

the idea that anything of value that belongs to Plaintiff will be retained by Crossroads, because,

as she describes, "we had a million dollar truck out there".


## ACTIONABLE CONDUCT


57.    Plaintiff believes the conduct by Crossroads Towing and Recovery to be documented (by them)

to be outrageous, and in violation of multiple civil and criminal statutes.


58.    Plaintiff reserves the right to amend this Complaint upon acquisition of more factual detail.


## CLAIM ONE: MULTIPLE VIOLATIONS OF COLORADO FAIR TOWING STATUTE

The Defendant(s) charged Plaintiff an excessive fee for the towing services.


> Title 40, Article 10.1, C.R.S. governs the Commission's role in the regulation of Towing Carriers. Towing Carriers are subject to permit, rate, insurance, and bonding requirements.
>
> Relevant Colorado Statutes to this Case (source): Public Utilities Commission, Colorado
>
> RULES REGULATING TRANSPORTATION BY MOTOR VEHICLE

> 4 CCR 723-6  including Revised towing legislation HB22-1314 [2022]
> https://drive.google.com/file/d/12aIol18rm9sYoxwWb7Gm-6vOknavPtbw/view

## CLAIM TWO: UNJUST ENRICHMENT

59.    Defendant Crossroads Towing has unjustly enriched itself by retention - with declared intent to

sell - his personal vehicle and personal property.

## CLAIM THREE: CIVIL THEFT

60.    Several regulations to protect Coloradans from what many consider to be "predatory" towing

practices took effect on Wednesday, thanks to a new state law passed in June.

61.    The moniquered *towing bill of rights, when* enacted, made several changes such as mandating

that towing companies provide a 24-hour notice before towing vehicles located on residential

properties. Other major changes include the following requirements for towing companies:

62.    Plaintiff believes that these cases are supportive of its claims and demonstrates a pattern of

behavior by towing companies in violating state and federal law.

63.    Plaintiff understands that under Colorado law, towing companies are subject to regulations and

restrictions designed to protect consumers from excessive fees and unethical business practices.

Some of the relevant provisions of Colorado law include:

## CLAIM FOUR    EXCESSIVE FEES

64.    C.R.S. §42-4-1203, which governs the fees that towing companies may charge for their services
and provides for penalties for charging excessive fees.

65.    Plaintiff feels the conduct of Defendant(s) is so egregious that only a SIGNIFICANT and
tangible investigation of Defendant's conduct will draw the genuine attention necessary from
Defendant(s)s to discourage it/them from ever crossing the greed line of irrationality as manifest
in this case with their impossible demands against sometimes involuntarily towed customers.

66.    Plaintiff further understands that under Colorado law towing companies are required to make
WILLFUL DISCLOSURE OF FEES AS PER CO C.R.S. C.R.S. §13-21-107.  In this case,
Defendants simplified their itemization to an absurd degree, inflating to outrageous values for
their towing and storage services.

67.    To that end, their horror story of accounting manifested in Defendant's non-specific invoice
wherein they billed Plaintiff for replicated 12 hour intervals of services.

68.    Considering the accident occurred, as per the police report issued by the Colo Highway Patrol, at
near midnight on the 19th of January, Defendant's tow bill states Plaintiff's vehicles were
delivered to Crossroad's Ft. Collins lot at 9:09 am. on the 20th.

69.    The likely maximum time Crossroad's technicians could have been on site would be perhaps six
(6) hours.

70. Nonetheless, *Crossroad's bill claims 12 hours for each and every piece of machinery allegedly used at the site.*

71. As such, Crossroads has deceptively gone out of their way to claim service hours when they were not there. Proportionately, there is absolutely no description of what these alleged, presumed industrial grade machines were doing at the site.

### CLAIM FIVE: WILLFUL REFUSAL TO RELEASE A VEHICLE UPON PAYMENT OF REASONABLE FEES AS PER CO C.R.S. §13-21-108

72. C.R.S. §13-21-108, which requires towing companies to release a vehicle to its owner upon payment of the **reasonable charges** for towing and storage services, and to provide an itemized statement of such charges.

73. Since Plaintiff has not been presented a bill for reasonable charges, it is the liability of the tow company that comes into question. Beyond that, because of Crossroad's willful refusal for Plaintiff to access any of Crossroads documentation, Plaintiff cannot verify any of Defendant's acts, or expenditure of resources.

74. As per the Defendant's invoice fees, the amounts defined and charged for towing by Defendant are not reasonable. The fees charged are exorbitant and outside prices charged by the industry. Honest comparables will be presented at trial.

75. As per the Defendant's invoice fees, the amounts defined and charged for storage by Defendant are not reasonable. The fees charged are exorbitant and outside prices charged by the industry. Again, testimony competitors will show that Defendants invented exorbitant fees in this case,

with the premeditated intent that to satisfy them Defendant should sign over the ownership of his

vehicles to Crossroads, or perhaps one of them personally.

## CLAIM SIX:  DECEPTIVE TOWING PRACTICES

76.    CROSSROADS TOWING AND RECOVERY has violated the terms of the Colorado statute

while operating on a Federal highway.  Crossroads is guilty of deceptive trade practices and

subject to enforcement action by the Colorado attorney general, and because said violations

occurred on Federal property their liability is established.

## CLAIM SEVEN:  AGGRAVATED MOTOR VEHICLE (AUTO) THEFT

77.    Aggravated motor vehicle (auto) theft in Colorado is when a person "knowingly obtains or

exercises control over the motor vehicle of another without authorization or by threat or

deception."

Under CRS § 18-4-409, sentencing can range from 6 months in jail to 12 years in state prison.

## CLAIM EIGHT:  DE-FACTO ATTEMPTED EXTORTION

78.    Likewise, while on Federal right of way, Crossroads has attempted to extort Plaintiff via serious

violations of trade practices.

79.    C.R.S. §13-21-109, which authorizes the Colorado Public Utilities Commission to enforce the

provisions of the towing regulations and provides for administrative penalties for violations of

the regulations.

80.  The Defendant(s)'s actions in formally charging and demanding Plaintiff pay outrageous and
     excessives fees constitutes criminal extortion, as well as violation of C.R.S. §18-3-207. Said
     statute(s) prohibit towing companies from excessive or false billing for tow and ancillary
     services.

81.  Worse, as factually and evidentiary documented, Defendant owners/office manager's demand for
     surrender of ownership of Plaintiff's vehicles as 'offset' to their extortionate fees is outrageous,
     and constitutes willful extortion.

82.  Likewise, 'we are keeping all your power tools and (anything of value)' as an offer of
     mitigation of Defendant's outrageous invoice can only be constituted and interpreted as a bold
     and outright confiscation by extortion.

83.  In the same context, 'pay us $3000 in addition in certified funds and we will allow you to come
     to collect your personal items' is such an egregious, selfish and unconscionable act as to not only
     violate decency, let alone the statutory obligations that Crossroads Towing and Recovery is
     ethically and statutorily duty bound to honor.

84.  Such a performance casts a dark shadow upon the industry that such a demand, by any towing
     company, could be considered, voiced or demanded.

85.  As a direct result of Defendant(s)'s excessive fee obstructions, Plaintiff has suffered direct
     damages - confiscation of vehicle, loss of the use of that vehicle, cost of investigation, the cost of
     preparing supporting documentation of Defendant's conduct for this filing; and, the mental
     anguish associated with Plaintiff having his only transportation held hostage.

86.    Plaintiff, pro se, reserves the right to amend this complaint via pending engagement of counsel; and, the time necessary to research and document the constitutional issues underwriting this action.

## TRIAL TO JURY

Plaintiff seeks trial to a jury.

## REQUEST FOR RELIEF

**WHEREFORE, Plaintiff respectfully requests that this Court enter judgment for the Plaintiff and against the Defendant(s), and grant Plaintiff the following relief:**

Defendant(s) have violated numerous provisions of Federal law and Colorado civil and criminal statutes in the form of violations by Plaintiff for charges of excessive fee for towing services. Further, by threats against Plaintiff demanding substantial, outrageous additional charges, Defendant has multiple criminal and civil liabilities. Plaintiff's losses are directly attributable to his standing up against Defendant(s)'s extortionary and confiscatory demands,

Plaintiff whereby asks the Court for:

a.    Statutory damages under state and federal regulatory statutes.

b.    Damages Plaintiff alleges attributable to Crossroads Towing and Recovery Defendants via acts that propose application of an appropriate message.

Specifically an award of damages sufficient to discourage/inhibit others in the industry from such outrageous conduct, and consistent with the mandates of recent years from the State of Colorado to thwart predatory misconduct of the towing industry.

In addition, Plaintiff seeks formal compensation for his losses; and, recommends
magnitude of damages consistent with protection of the public good aimed to inhibit
repetition by Crossroads of further civil and criminal acts against other innocent parties.

c.    To that end, Plaintiff requests the Court consider a 'red flag award' of significant
punitive damages be granted to Plaintiff.

Plaintiff suggests, due to the magnitude of the egregious acts by Defendants, this case
merits an **award** *of triple-damages to the Plaintiff; e.g. in an amount* ***THREE TIMES
CROSSROAD'S HIGHEST INVOICED CHARGES AS DEMANDED FROM
PLAINTIFF.***

*Such a punitive amount is wholly justified and appropriate.*

Respectfully submitted,

Todd Wargo
Plaintiff pro se

Dated this 27th day of February, 2023

Todd Wargo
PO Box 1462
Parker, CO 80134

303.598.4624
wargovcrossroads@gmail.com

Wargo v Crossroads   Complaint,  Dist of Colo   02.27.23

# CERTIFICATE OF SERVICE

I, Todd Wargo, Plaintiff pro se do hereby affirm that a true copy of Plaintiff's filing

## COMPLAINT
(case no.                    )

was served upon Defendant Corporation Crossroads Towing and Recovery LLC,
by personal service agent to the registered agent for the company -

**key2 Accounting
375 E. Horsetooth Rd. #2-202
Ft. Collins, CO 80525**

with a copy transmitted to key2's published email address of:

info@key2accounting.com

plus, a copy supplied by US mail to the company's registered address of:

**Crossroads Towing and Recovery LLC,
a Colorado Corporation (Company No. 20218045237)
Registered offices: 3700 Canal Drive, Ft. Collins, CO 80524**

and; by personal service to the published address for Defendant;

Kelsey Reapsome Clendenin, individually, and as owner/agent for Crossroads Towing and Recovery

Crossroads Towing and Recovery LLC,
a Colorado Corporation (Company No. 20218045237)
Registered offices: 3700 Canal Drive, Ft. Collins, CO 80524

and; by personal service to the published address for Defendant;

Vonda Ulander, individually, and as owner/agent for Crossroads Towing and Recovery

Crossroads Towing and Recovery LLC,
a Colorado Corporation (Company No. 20218045237)
Registered offices: 3700 Canal Drive, Ft. Collins, CO 80524